## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

LOIS NEMETH,

      Plaintiff,                         Case Number: 2:08-cv-15326

v.

                                           Paul D. Borman

CITIZENS FINANCIAL GROUP, INC.         United States District Judge
d/b/a CHARTER ONE BANK,

      Defendant.

_____/

## OPINION AND ORDER GRANTING IN PART AND DENYING IN PART
## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

This matter comes before the Court on Defendant Citizens Financial Group d/b/a Charter

One Bank's ("Defendant," "Charter One," or the "Bank") motion for summary judgment regarding

Plaintiff Lois Nemeth's ("Plaintiff" or "Nemeth") claims that Charter One unlawfully discriminated

and retaliated against her on account of her association with and advocacy on behalf of Arab-

Americans in violation of Title VII, 42 U.S.C. § 200e-2(a), and Michigan's Elliot-Larsen Civil

Rights Act ("ELCRA"), Mich. Comp. Laws. § 37.2202(a).  (Dkt. No. 28.)  Plaintiff has filed a

response (Dkt. No. 34), and Defendant has filed a reply.  (Dkt. No. 38.)  Oral arguments were heard

on April 27, 2011.  For the following reasons Defendant's motion for summary judgment is

GRANTED IN PART and DENIED IN PART.

## I.      Background

Plaintiff began working for Defendant's predecessor First Federal of Michigan in April 1982

as a bank teller.  (Pl.'s Resp. 1.)  She eventually worked her way up from teller to head teller, to

assistant manager, and then to branch manager.  (*Id.*)  In February 2001, Plaintiff became the branch manager of the Michigan/Schaefer branch (the "Branch") in Dearborn, Michigan.  (*Id.*)  The Dearborn community has many Arab-American businesses and residents.  Plaintiff was promoted to Branch Manager II, and in February 2005, she was promoted again to the position of Assistant Vice President.  (*Id.*)  As a branch manager, Plaintiff reported to a regional manager.  In 2004 and 2005, her regional manager was John Felici ("Felici").  (*Id.* at 1 n.1.)  In 2006, her regional manager was Pamela Larsen ("Larsen").  (*Id.*)  Felici returned as Plaintiff's regional manager at the beginning of 2007, and remained in that position through Plaintiff's termination on March 30, 2007.  (*Id.*)  Felici reported to Karen Minghine ("Minghine"), while Larsen reported to Keith Mazur ("Mazur"), who in turn reported to Minghine.  (*Id.*)

In the Fall of 2004, Defendant acquired Charter One.  (*Id.* at 1.)  Plaintiff claims that Defendant instituted a number of policies that discriminated against the Branch's Arab-American customers.  (*Id.* at 1-2.)  For example, Defendant did not offer Arabic as a language option for its ATM prompts.  Defendant required that business customers making large cash deposits use armored-car services at their own expense and drop the cash off at depositories instead of the Branch.  (*Id.* at 2.)  Defendant also refused to provide religious customers the option of opening non-interest bearing "Islam" savings accounts, even though some customers refused to open accounts that accrued interest because it was against their religion.[1]  Plaintiff further claims that Charter One also prohibited tellers from helping customers fill out their deposit slips, thereby discriminating against Arab Americans who did not speak English and had trouble filling out the slips on their own.

The issue Plaintiff was most concerned about, however, was Defendant's closing of

---

[1]  Customers could open non-interest bearing checking accounts.

2

approximately 350 accounts at the Branch that belonged to Arab-American customers.   (*Id.*)
Plaintiff alleges that her Branch was singled out with respect to such closures due to the fact that the
majority of its customers were Arab Americans.   (*Id.*)   Plaintiff claims that she discussed her
concerns regarding the account closures with a number of employees within Charter One, including
her managers Felici and Larsen, Mazur, and Minghine.  (*Id.*)  Although she only specifically recalled
complaining that the closures were discriminatory to Felici and Larsen, she believes she told
Minghine in the beginning of 2006 that some in the Dearborn community felt like Charter One was
discriminating against Arab Americans.  (*Id.* at 2-3.)  She also claims she told Mazur that she was
having a horrible time with the closures, and that the community was feeling discriminated against.
(*Id.* at 3.)

In December 2006, Erika Cartagena ("Cartagena"), a banker at the Branch, who reported to
Plaintiff, called Charter One's CEO Larry Fish to voice her concerns about the discriminatory
treatment of Arab-American customers.  (*Id.*)  Within a few hours, Plaintiff received a call from Deb
King, the supervisor of the Anti-Money Laundering ("AML") division to discuss Cartagena's call.
(*Id.*)  Plaintiff was then called by Larsen who Plaintiff alleges said "Lois, you know, we never say
the word 'discriminate' or 'red line.'  And Erika [Cartagena] used this several times with Larry
[Fish].  And the call came to Karen [Minghine], and I got the call from Keith [Mazur]."  (Def.'s
App. Ex. A, Deposition of Lois Nemeth 165:6-9, Jan. 21, 2010.)  Larsen also scheduled a meeting
for the next day.  Plaintiff claims that during that meeting Larsen again reiterated to her that "we
don't use the word 'discriminate,' we don't use the word 'red line.'" (*Id.* at 166:5-7.)

Shortly thereafter in mid-December, Plaintiff claims Akram Turk ("Turk"), another Branch
employee, called her and told her "almost every day we're getting tons of close-outs," and opined

3

that he thought Defendant was "paying us back for what happened."[2]   (*Id.* at 170:10-12.)  After talking to Turk, Plaintiff called Denise Soto ("Soto"), a friend of hers who worked in the AML department, to discuss the account closures.  Apparently Soto told Plaintiff "honey, I'm telling you right now . . . you need to be very careful . . . ." (Nemeth Dep. 172:12-14.)  Soto then allegedly said "they have got these accounts marked OFAC and there is no way they're OFAC."[3]  (*Id.* at 172:14-16.)  Plaintiff claims that she became very upset and told Soto "if you call my branch one day and I'm not there, you'll – you'll know what happened." (*Id.* at 172:16-19.)

In late January 2007, Plaintiff and her staff were required to attend a meeting conducted by AML supervisor Deb King about how the AML department functions.  (Pl.'s Resp. 4.)  Plaintiff felt that the meeting simply told them basic things they already knew about the job duties of the AML division and that it "was like we were being hand slapped."  (*Id.*)  Plaintiff also testified that there was no discussion about complaints that Charter One policies or account closures were discriminatory or the policies' effect on Arab-American customers.  (Nemeth Dep. 244:13-245:23.)

On March 7, 2007 an anonymous letter (the "Anonymous Letter") was sent to Charter One's CEO Larry Fish accusing Plaintiff and her staff of improper banking activity.  (Def.'s App. Ex. D, Deposition of John Felici, Jan. 25, 2010, Ex. 1.)  The Anonymous Letter stated "[t]here is a big fraud going on in Michigan, Dearborn, especially at the branch at Schaefer and Michigan where some of the members that includes the manager Lois [Nemeth], the banker Erica [Cartagena] [sic] and the

---

[2] During his deposition, however, when asked if the number of account closures increased after the phone call Turk testified "I don't know.  I have no answer for that, I don't know.  I don't remember how much accounts were, if it raised or reduced, no."  (Def.'s App. Ex. N, Deposition of Akram Turk 30:16-24, Jan. 27, 2010.)

[3] OFAC is apparently a designation AML uses to flag accounts suspected of laundering money.

BBO Mahmoud [Serhane] and I think the regional manager in this area are involved in it." (*Id.*) The letter went on to accuse those persons of dealing with a "mortgage person whose office is at Nine Mile in Detroit" who the author claimed was charging customers to help them obtain loans.[4] (*Id.*) The author also alleged that "[t]he manager of this branch has already a gas station with her Iraqi boyfriend!!!" (*Id.*) Plaintiff did in fact have an ownership interest in a gas station with her business partner Maher Ankouni ("Ankouni"), who is Lebanese. (Pl.'s Resp. 4-5.) Plaintiff is married to Zoltan Nemeth.

As a result of the Anonymous Letter's accusations, Charter One opened a Corporate Security investigation (the "Investigation"). (*Id.* at 4.) Defendant's Corporate Security Regional Investigations Manger, Candace Gardin ("Gardin"), was in charge of the investigation. Gardin interviewed many of the Branch's employees.

Plaintiff was interviewed (the "Interview") on March 14, 2007 at Charter One's headquarters in Southfield, Michigan by Corporate Security investigators Gardin and Courtney Gilbert[5] ("Gilbert"). (*Id.*) The Interview allegedly lasted seven and a half hours. (Nemeth Dep. 269:18-21.) Plaintiff claims that during the Interview she was treated unprofessionally and harassed because of her association with Ankouni. (Pl.'s Resp. 4-5.) Plaintiff claims that although the Investigation was supposed to be about alleged loan brokering, the focus of Gardin's questioning centered on Plaintiff's personal life, and her relationship with Ankouni. (*Id.* at 4.) Allegedly, Gardin repeatedly accused Plaintiff of sexual improprieties with her "Iraqi boyfriend," and asked

---

[4] These claims actually describe what are known as loan brokers. All agree that it is against Charter One policy to deal with brokers. (Pl.'s Resp. 5 n.6.)

[5] Courtney Gilbert has since changed her name to Courtney Peck; in this case, the parties and the Court refer to her as Gilbert.

5

her if Ankouni was a "friend with benefits" or if she was "getting a little bit of something-something on the side." (*Id.* at 4-5.)

With regard to the loan broker issue, Plaintiff also claims that Gardin repeatedly accused her of knowingly dealing with Sleiman "Sam" Haidar ("Haidar") who Gardin believed was a broker. (*Id.* at 5.) Plaintiff admitted that she worked with Haidar, and that she and Cartagena had gone out to a business dinner with him to discuss switching his accounts from National City to Charter One, however, Plaintiff claims that she was emphatic with him that if he charged people for loans he could not open an account with Charter One. (Nemeth Dep. 358:19-359:20.)

At the end of the Interview, Plaintiff claims Gardin coerced her into making a signed statement (the "Statement") that was untrue.[6] (*Id.* at 346:18-352:9.) Indeed, Plaintiff claims the first statement she wrote was torn up by Gardin. (*Id.* at 347:2-3.) Further, she alleges that she wrote a second statement that was not accepted and also torn up. (*Id.* at 347:13-20.) Plaintiff claims that she was so exhausted at the end of the Interview that after Gardin rejected her first two statements she finally asked "what do I need to say to get out of here?" (*Id.* at 291:7-9.) Gardin then created the Statement, which Plaintiff contends contains many inaccurate facts, and in which Plaintiff assumed responsibility for knowingly dealing with a loan broker.[7]

After her Interview, Plaintiff was placed on paid suspension due to the fact that the Investigation was ongoing. Plaintiff was instructed not to talk to any colleagues or customers about the Investigation and to make herself available for further questioning. (Def.'s Br. 5-6.) Gardin and Mazur claimed that from March 21-29, 2007 they repeatedly tried to contact Plaintiff about setting

---

[6] The Statement can be found as Exhibit 15 to Plaintiff's deposition.

[7] Fuller details of the Statement are in the Discussion section, *infra.*

up another interview. (*Id.* at 6.) Gardin testified that she tried calling Plaintiff's home and cell phone three times, on March 21, 27, and 28 and left messages asking Plaintiff to call her back. Mazur stated that he tried calling Plaintiff on March 29, and left a message directing her to meet with him on March 30. (*Id.*)

Mazur, Minghine, and HR Director Kelly Schaefer ("Schaefer," collectively the "decision-makers") decided to terminate Plaintiff's employment on March 30 after Plaintiff failed to show up for a second interview or return any of Gardin or Mazur's messages. (*Id.* at 6-7.) There was also evidence that the decision-makers relied, in part, on information learned in the Investigation. (*Id.* at 7.) On April 2, 2007, Plaintiff received a letter from Schaefer (the "Termination Letter") informing her that she had been fired for violating Section 8.3 of Charter One's Code which requires employees to cooperate with ongoing investigations. (Nemeth Dep. Ex. 16.) The Termination Letter also said that Defendant believed her failure to return Gardin/Mazur's calls was an indication she had abandoned her job. (*Id.*)

Plaintiff claims that she never received any of the calls or messages Defendant's agents left. (Pl.'s Resp. 6.) She claims that her husband had her cell phone and she was not answering her phone because she was depressed and because she had been told not to talk to customers or coworkers. (*Id.*) Plaintiff also testified that she did not check her home answering machine, that it had become full, and that at some point she erased the messages from this time without listening to them. (Nemeth Dep. 294:1-13, 295:17-296:24.) Plaintiff also stated that she sent Felici a text message regarding a performance evaluation for Turk and that her husband had tried to call Felici as well while she was suspended. (Pl.'s Resp. 6.)

Plaintiff claims that the Investigation, her suspension, and her ultimate termination were

motivated by unlawful discrimination based on her association with, and advocacy for, Arab Americans. She also contends that during the Interview she was harassed because of her association with Ankouni. Furthermore, she claims that the harassment was so severe that it created a hostile work environment. Finally, she alleges that Defendant retaliated against her in violation of the ELCRA for her complaints against Charter One's policies which she believes discriminate against Arab-American customers.

## II.    Standard of Review

Summary judgment is only appropriate if there are no genuine issues of material facts and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c). A genuine issue of material fact exists when there is "sufficient evidence favoring the non-moving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); *see also Henderson v. Walled Lake Consol. Schs.*, 469 F.3d 479, 487 (6th Cir. 2006). When applying this standard, courts must view all materials, including all of the pleadings, in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

The moving party bears the responsibility of establishing no issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party meets its burden, the non-moving party must go beyond the pleadings and come forward with specific facts to demonstrate that there is a genuine issue for trial. *Id.* at 324. The non-moving party must do more than show that there is some abstract doubt as to the material facts. It must present significant probative evidence the issue exists in order to defeat a motion for summary judgment. *See Moore v. Philip Morris Cos.*, 8 F.3d 335, 339-40 (6th Cir. 1993).

III.    **Discussion**[8]

A.    **Discrimination Under Title VII And The ELCRA**

Plaintiff claims that "Defendant's actions with respect to the March 2007 investigation, suspension of Plaintiff, and termination of her employment based on her close association with Arab-Americans and Lebanese business associate, constituted unlawful discrimination" in violation of Title VII and the ELCRA.  (Compl. ¶¶ 28, 36.)  Both Title VII and the ELCRA prohibit an employer from discriminating against an employee with respect to compensation, terms, conditions, or privileges of employment based on that individual's national origin.  *See* 42 U.S.C. § 200e-2(a)(1); Mich. Comp. Laws. § 37.2202(a).  Courts use the same burden-shifting analysis the United States Supreme Court articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) to analyze claims brought pursuant to the ELCRA, and Title VII.  *See, e.g.*, *Curry v. SBC Commc'ns, Inc.*, 669 F. Supp. 2d 805, 824 (E.D. Mich. 2009); *Hazle v. Ford Motor Co.*, 456 Mich. 456, 462 (2001) (applying *McDonnell Douglas* to discrimination claim under the ELCRA).  Accordingly, both of Plaintiff's discrimination claims will be analyzed in this section.

The ultimate question in every case alleging disparate treatment on the basis of national origin is "whether the plaintiff was the victim of intentional discrimination."  *Id.* (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 153 (2000)).  To establish intentional discrimination, the plaintiff must demonstrate direct evidence of discrimination or present sufficient circumstantial evidence to allow an inference of discrimination.  *Id.* (quoting *Johnson v. Kroger Co.*,

---

[8] The Court notes at the onset that Defendant has asked that the Court dismiss Plaintiff's case because Defendant claims she perjured herself during her deposition.  (Def.'s Br. 20.)  The Court holds that even assuming, without deciding, that Plaintiff perjured herself during her deposition dismissal would be inappropriate in this instance and the Court declines to exercise its discretion to throw out Plaintiff's Complaint.

319 F.3d 858, 864-65 (6th Cir. 2003)).

Direct evidence does not require the jury to draw any inferences to determine that the adverse employment action was motivated, at least in part, by racial prejudice. *Id.* at 825 (quoting *In re Rodriguez*, 487 F.3d 1001, 1007 (6th Cir. 2007)). "Evidence of discrimination is not considered direct evidence unless [an improper] motivation is explicitly expressed." *Amini v. Oberlin College*, 440 F.3d 350, 359 (6th Cir. 2006). Here, Plaintiff has not presented any evidence of direct discrimination by Defendant.

Even without direct evidence though, Plaintiff can still prevail if she can establish an inferential case of discrimination under *McDonnell Douglas*. *Curry*, 669 F. Supp. 2d at 824-25. Under the *McDonnell Douglas* test, which was clarified by *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248 (1981), the plaintiff must first prove a *prima facie* case of discrimination. *Burdine*, 450 U.S. at 252-53; *Kline v. Tenn. Valley Auth.*, 128 F.3d 337, 342 (6th Cir. 1998). If the plaintiff makes out a *prima facie* case, the burden shifts to the defendant to articulate a "legitimate, nondiscriminatory reason" for the adverse action. *Burdine*, 450 U.S. at 252-53 (quoting *McDonnell Douglas*, 411 U.S. at 802). If the defendant is able to articulate a legitimate reason, the burden then shifts back to the plaintiff who must prove the given explanation was merely a pretext for unlawful discrimination. *Id.* at 256.

### 1.     The *Prima Facie* Case

A plaintiff establishes a *prima facie* case of discrimination by demonstrating that "(1) she is a member of a protected group, (2) she was subject to an adverse employment decision, (3) she was qualified for the position, and (4) she was replaced by a person outside of the protected class." *Russell v. Univ. of Toledo*, 537 F.3d 596, 604 (6th Cir. 2008) (quoting *Carter v. Univ. of Toledo*, 349

F.3d 269, 273 (6th Cir. 2003)) (quotation marks omitted).  The fourth prong can also be satisfied by showing that the plaintiff was treated differently than similarly situated employees who did not belong to the protected class.  *Id.* (quoting *Newman v. Fed. Express Corp.*, 266 F.3d 401, 406 (6th Cir. 2001)).  For the following reasons, the Court holds that Plaintiff has established a *prima facie* case of discrimination.

### i.       Member of a Protected Class

Although Plaintiff herself is not an Arab American, she argues that she is a member of this protected class based on her association with Arab Americans and her advocacy on their behalf.  (Pl.'s Resp. 9-10.)  This is demonstrated, she argues, through her business partnership with Ankouni, her involvement in the Arab-American community in and around Dearborn, and her efforts to protest what she believed to be discriminatory policies at Charter One against Arab Americans.  (*Id.*)

The Sixth Circuit has held that such association/advocacy can form the basis for an individual to be considered part of a protected class.  *See, e.g.*, *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 574-75 (6th Cir. 2000) (citing *Sullivan v. Little Hunting Park, Inc.*, 396 U.S. 229, 231-37 (1969)); *Winston v. Lear-Siegler, Inc.*, 558 F.2d 1266, 1270 (6th Cir. 1977) (holding a white plaintiff had standing to sue his former employer under 18 U.S.C. § 1981 for terminating him after he protested the alleged discriminatory firing of a black co-worker).  In *Johnson*, the court held that the plaintiff, who was a white affirmative action official at the university, had standing to bring a claim under Title VII against the university for sanctions it allegedly imposed against him in retaliation for his advocacy on behalf of women and minorities.  215 F.3d at 577.  The Sixth Circuit found that his complaints were protected activity, and that he was a member of a protected class.  *Id.*

Defendant claims Plaintiff cannot meet this criterion because her "association" is what

11

Charter One pays her to do, and therefore cannot form the basis of her Complaint.  (Def.'s Br. 18.)

Defendant's argument, however, was explicitly rejected in *Johnson*.  *See* 215 F.3d at 577.  In fact,

the *Johnson* court rejected a much more forceful illustration of Defendant's argument.  The Sixth

Circuit stated, "[s]imply because the employer has placed an individual in the position of a high-

level affirmative action officer and contracted with the individual to advocate on behalf of women

and minorities . . . does not thereby immunize the employer from being held liable for illegally

discriminating against that individual for such advocacy."  *Id.*  Furthermore, part of Plaintiff's claim

is that she was discriminated against because of her association with Ankouni.  Accordingly, the

Court finds that Plaintiff has satisfied the first prong of her *prima facie* case.

### ii.  Adverse Employment Action

An adverse employment action is anything that "constitutes a significant change in

employment status," and can include hiring and firing decisions, failing to promote an employee,

reassigning an employee to a position with significantly different responsibilities, or a drastic change

in benefits.  *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 403 (6th Cir. 2008) (quoting

*Burlington Indus. v. Ellerth*, 524 U.S. 742, 761 (1998)).  However, "petty slights, minor annoyances,

and simple lack of good manners" cannot constitute an adverse action.  *Burlington N. & Santa Fe*

*Ry. Co. v. White*, 548 U.S. 53, 68 (2006).  Plaintiff was suspended and eventually terminated.  Thus,

this requirement is clearly met.  *See White*, 533 F.3d at 403.

### iii.  Plaintiff Was Qualified For Her Position

Plaintiff must also establish that she was qualified for the position she was ultimately fired

from in order to make out a *prima facie* case.  *See Russell*, 537 F.3d at 604.  Plaintiff worked at

Charter One for twenty five years, was promoted various times from teller to Assistant Vice

12

President, and consistently received favorable performance reviews which earned her numerous accolades, awards and compensation increases during her tenure. (Pl.'s Resp. 1.) The Court finds that Plaintiff has satisfied this prong.

### iv.    Replaced By A Non-Protected Individual

Plaintiff can establish this requirement if she demonstrates that Dave Solano, the person Charter One hired to replace her, was not a member of Plaintiff's protected class. Defendant argues that Plaintiff has presented no evidence regarding this prong. (Def.'s Reply 5.) In support of this contention, Defendant points to the deposition testimony of Felici who stated that Solano has appealed account closures and has advocated for the same types of changes in corporate policy that Plaintiff did, such as having the brochures printed in Arabic, Arabic prompts on the ATMs and Arabic signage. Def.'s App. Ex. D, Deposition of John Felici 109:18-24, 111:6-11, Jan. 25, 2010)

Plaintiff, on the other hand, argues that it is undisputed that he did not have an Arab-American business partner, was not accused of having an "Iraqi boyfriend" (or girlfriend), and never complained that Charter One's policies were discriminatory toward Arab-American customers. (Pl.'s Resp. 16.) During his deposition, Felici stated that Solano has never complained that any of the Bank's policies discriminated against Arab Americans. (Felici Dep. 111:21-25.) Because at the very least there is a genuine issue of material fact regarding whether Solano can be considered a member of Plaintiff's protected class based on his association with or advocacy for Arab-American customers, the Court finds this prong is also satisfied. Thus, the Court holds that Plaintiff has established a *prima facie* case.

### 2.    Legitimate, Non-Discriminatory Reason

Once the plaintiff presents sufficient evidence to make out a *prima facie* case, the burden

shifts to the defendants to state a "legitimate, nondiscriminatory reason" for the adverse action. *Burdine*, 450 U.S. at 252-53 (quoting *McDonnell Douglas*, 411 U.S. at 802). Plaintiff's Complaint alleges that the Investigation, her suspension, and her termination were all the product of unlawful discrimination. (Compl. ¶¶ 28, 36.) Accordingly, the Court will analyze those three adverse employment actions separately.

### i.     The Investigation

Plaintiff claims that the real reason the Investigation was launched was because of her association with Arab Americans, particularly her business partner Ankouni. (Nemeth Dep. 316:5-24.) Plaintiff suggests that this was the case because the Interview was supposed to be about violations in connection with the alleged mortgage broker but did not focus on that. Instead, Plaintiff argues it focused on her alleged relationship with her "Iraqi boyfriend" and her personal life. (*Id.*)

Defendant contends that any time it is confronted with allegations of fraud at one of its branches it investigates to see whether there is any truth to the claims. Indeed, several employees corroborated that this was Charter One's policy. (Felici Dep. 77:17-19; Def.'s App. Ex. E, Deposition of Kelly Schaefer Dep. 27:8-16, Feb. 24, 2010.) Plaintiff herself also admitted as much. (Nemeth Dep. 316:21-22.) At her deposition she testified, "alleged wrongdoing was enough that an investigation would be warranted." (*Id.*) As a result, the Court finds that Defendant has sufficiently articulated a legitimate, non-discriminatory reason for initiating the Investigation against Plaintiff.

### ii.     The Suspension

Several employees testified that it was Charter One's common practice to place employees

14

on an investigative suspension during a Corporate Security investigation. (Def.'s App. Ex. C, Deposition of Karen Minghine 63:25-64:14, Mar. 4, 2010; Ex. B, Deposition of Keith Mazur 45:16-24, Feb. 4, 2010.) Mazur stated that he has been involved in the suspension of at least ten employees while Corporate Security investigations were being conducted against them. (Mazur Dep. 45:16-24.) He said that the suspension was ordered because there were unanswered questions, and that "the fact that there was an investigation pending was the reason she was suspended." (Mazur Dep. 38:24-39:15.) When the decision to suspend her was made, Mazur claimed he had no opinion as to whether Plaintiff was actually guilty of violating company policy. (*Id.* at 43:13-24.)

Shaefer testified that she supported suspending Plaintiff because the conduct she was accused of in the Letter was a terminable offense and the investigation was still ongoing so "it was important to [Schaefer] to act consistently with the way [she] would treat anyone else." (Schaefer Dep. 35:3-9.) Also, even though Schaefer originally did not think anything would come of the Investigation, she could not ignore the Statement Plaintiff allegedly voluntarily prepared indicating she knew violations were taking place and that she was responsible for them. (*Id.* at 36:10-13.) When asked whether other portions of the Statement that suggested violations did not occur (like the bottom of the first page where Plaintiff states she talked to the customer allegedly being charged fees who told her he was not) affected her impression about Plaintiff's guilt, Schaefer stated "[i]t made it unclear to me, which is part of what made me believe that it needed further investigation." (Schaefer Dep. 37:8-38:2.) In light of this testimony, the Court finds that Defendant has stated a legitimate, non-discriminatory reason for suspending Plaintiff at the conclusion of her Interview on March 14, 2007.

### iii.    The Termination

Charter One requires its employees to cooperate with investigations. (Def.'s Br. Ex. G,

Declaration of Adriana Seaton ¶ 3, July 15, 2010.)  Section 8.3 of Charter One's Code of Business Conduct and Ethics states that "[e]mployees must fully cooperate with all internal investigations conducted by the Company."  (Seaton Decl. Ex. 1, at 4.)  It also warns that "[f]ailure or refusal to cooperate with Company-sanctioned investigations . . . may result in disciplinary action, up to and including termination of employment."  (*Id.*)  At the end of the initial Interview, Plaintiff was suspended and told to make herself available for further questioning.  (Nemeth Dep. 292:18-22; Mazur Dep. 55:5-7; Def.'s App. Ex. H, Deposition of Candace Gardin 88:5-25, Feb. 16, 2010.)  This was common practice for corporate security investigations.  (Felici Dep. 105:4-9.)  Subsequently, Gardin and Mazur tried calling Plaintiff several times to set up another interview, and left multiple messages on Plaintiff's home and cell phone.  (Gardin Dep. 95:10-97:7; Mazur Dep. 47:10-17.)

Plaintiff testified that she did not answer her home phone or her cell phone during this time or check her messages.  (Nemeth Dep. 294:1-13, 296:3-24.)  She also stated that her husband had her cell phone because she had been told not to discuss the Investigation with coworkers or clients and she was in a deep state of depression.  (*Id.*)  Plaintiff stated that if anyone had called and left a message on either her home or cell phone she would not have known.  (*Id.* at 296:19-24.)

Defendant claims that Plaintiff was terminated for failing to adhere to Charter One's policy requiring employees to cooperate with ongoing investigations and job abandonment.  (Def.'s Br. 6; Nemeth Dep. Ex. 15.)  Minghine testified that Plaintiff was fired because she did not respond to Defendant's attempts to get a hold of her.  (Minghine Dep. 69:2-4.)  Not only did this violate the policy requiring cooperation with investigations, Defendant also construed it as an indication that Plaintiff had abandoned her job.  (Nemeth Dep. Ex. 15.)  The Court holds that these preferred reasons are sufficient to satisfy this aspect of the *McDonnell-Douglas* test.

### 3.       Pretext

Despite Defendant's non-discriminatory reason for initiating the Investigation, suspending, and ultimately terminating Plaintiff, she can still successfully recover on her discrimination claims if she can demonstrate that Defendant's reasons were merely a pretext.  *Burdine*, 450 U.S. at 256. Generally, pretext can be shown by evidence that: (1) the proffered reason has no basis in fact; (2) the articulated explanation did not actually motivate the adverse action; or (3) the stated reason was insufficient to motivate the action.  *Curry*, 669 F. Supp. 2d at 828 (quoting *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994)).

The plaintiff will not meet this burden by merely demonstrating that the stated reason was pretextual.  Rather, the employee must prove that it was a pretext for unlawful discrimination. *Hazle*, 464 Mich. at 465-66.  It is insufficient to simply show that the employer's decision was wrong or mistaken, because the factual dispute is whether discriminatory animus motivated the employer not whether the employer is "wise, shrewd, prudent, or competent."  *Id.* at 476; *see also Comiskey v. Auto. Indus. Action Group*, 40 F. Supp. 2d 877, 896 (E.D. Mich. 1999) ("[T]he question is not whether the employer's reasons are *right*, but whether the employer's description of its reasons is *honest*.") (quoting *Kariotis v. Navistar Int'l Trans. Corp.*, 131 F.3d 672, 677 (7th Cir. 1997)) (emphasis in original).  To avoid summary judgment, the plaintiff only needs to establish a genuine issue of material fact as to whether the employer's proffered reason was a pretext.  *Hazle*, 464 Mich. at 465 n.10.   "[T]he ultimate question is whether the plaintiff established a question of material fact upon which reasonable minds could differ regarding whether discrimination was a motivating factor, i.e., made a difference, in the employer's decision."  *Ahmed v. Visteon Auto. Sys.*, No. 248411, 2004 WL 2601206, at *3 (Mich. App. Nov. 16, 2004).

Plaintiff claims she has raised a genuine issue of material fact regarding whether Defendant's legitimate reason was pretext. The Court, however, will first deal with Plaintiff's arguments that do not demonstrate pretext. Plaintiff argues that Defendant's proffered reason for firing her – "job abandonment" – had no basis in fact because she did not, in fact, abandon her job. (Pl.'s Resp. 17.) Plaintiff points out that she texted Felici regarding her assistant's performance review, and her husband called him. (*Id.*) Furthermore, Plaintiff argues that the job abandonment policy does not even apply to a suspended employee. (*Id.*) Schaefer testified that she did not believe that the policy technically applied to Plaintiff's situation. (Schaefer Dep. at 51:1-6.) These arguments, however, ignore the fact that Plaintiff was fired because she did not return Gardin and Mazur's phone calls to set up another interview, which violated Charter One's policy regarding cooperation with ongoing investigations. (Nemeth Dep. Ex. 16.) There is also no evidence that those who decided to terminate Plaintiff were aware that she texted Felici or that her husband called him. Even evaluating the facts in the light most favorable to Plaintiff, no reasonable jury could infer that Mazur, Schaefer, or Minghine had any reason to believe that Plaintiff had not gotten their messages or had contacted Defendant in any way.

Plaintiff also argues that "Defendant's attempt to use Plaintiff's alleged violation of company policy 'after the fact' in an effort to defend the termination decision is further evidence of pretext." (Pl.'s Resp. 19.) The Termination Letter written on March 30, 2007, however, clearly demonstrates that the reason Plaintiff was fired was because she did not cooperate with the ongoing Investigation in violation of company policy. It states,

> The terms of your investigative suspension included making yourself available to cooperate and assist with the investigation. Candace Gardin reviewed this expectation with you during your first interview. In addition, our Code of Ethics clearly states that

18

> colleagues are expected to cooperate in all investigations.  You have repeatedly ignored contact attempts by Candace Gardin on 3/21, 27, and 28 and Keith Mazur on 3/29.  We consider this a violation of the terms of your suspension and an indication that you have abandoned your job.  Therefore, we are terminating your employment as a Branch Manager with Charter One effective March 31, 2007.

(Nemeth Dep. Ex. 16.)  This shows that Defendant has not changed its story at any time.

Many of Plaintiff's other allegations support her contention that the decision to fire her for failing to return calls from Gardin and Mazur was pretext.  Plaintiff claims that "Charter One's abject failure to take reasonable steps to confirm whether Plaintiff in fact 'abandoned her job' demonstrates that this purported justification for her termination is 'unworthy of credence,' and thus was a pretext for discrimination."  (Pl.'s Resp. 19.)  Plaintiff argues that Defendant should have tried calling her parents or sent her a letter by certified mail before concluding that she was not cooperating with the Investigation or had abandoned her job.  (Nemeth Dep. 303:13-20.)  At oral argument, Defense counsel argued that Charter One was not obligated to try to notify Plaintiff by mail, and that it is improper for the Court to base its decision on how the Bank when about notifying Plaintiff.

Although Defendant did not have a duty to confirm whether Plaintiff actually received the numerous messages it left or in fact abandoned her job, a reasonable juror could infer that the Bank's decision not to send Plaintiff, a 25-year employee, a letter to try to reach her after failing to do so by phone, coupled with the fact that in terminating her it sent her a termination letter, demonstrated that they did not really care whether she got back in touch with them or not because they had already decided to fire her.  The Court finds that while Defendant's failure to send Plaintiff a letter is certainly not conclusive on the issue of pretext, it is also not wholly irrelevant.

Plaintiff next claims that the reason Charter One gave for terminating her was insufficient

19

to explain such harsh action.  (Pl.'s Resp. 19.)   Although Plaintiff attempts to characterize Defendant's reason as "not returning phone messages," the actual reason Defendant gave was that Plaintiff did not cooperate with the Investigation – a clear violation of company policy.  (Nemeth Dep. Ex. 16.)  Section 8.3 of the Code explicitly states that failure to cooperate with an ongoing investigation may result in termination.  (Seaton Dec. Ex. 1, at 4.)  While Plaintiff may find it wrong to fire an employee of nearly 25 years for allegedly causing that code violation, the Court will not dissect whether Charter One's employment decisions were right, only whether they were discriminatory.  *See Comisky*, 40 F. Supp. 2d at 896.  Having said that, while a jury would be unable to find that the allegations contained in the Termination Letter were false or that the decision to terminate Plaintiff was not in accordance with the strict letter of Charter One's written policy, a reasonable juror could infer that terminating a 25-year employee with an otherwise untarnished employment history for that infraction, without sending a letter, setting a second meeting, and further hearing her side of the story, was evidence of pretext for unlawful discrimination in light of Plaintiff's other allegations.

Plaintiff also argues that the results of the Investigation were the real reason for her termination.  (Pl.'s Resp. 18.)  Plaintiff emphasizes that all of the information the decision-makers (Mazur, Schaefer, and Minghine) had about the Investigation came from Gardin.  (*Id.*)  Because Plaintiff contends that Gardin harassed her during the Interview because of her association with Arab Americans, she argues that this information was tainted.  Therefore, even if the decision-makers were not discriminating against her, they were relying on discriminatory information which

evidences pretext.  *See Madden v. Chattanooga City Wide Serv.*, 549 F.3d 666, 678 (6th Cir. 2008).[9]

The Court agrees that the evidence, when viewed in the light most favorable to Plaintiff, demonstrates that a genuine issue of material fact exists regarding whether the results of the Investigation were a motivating factor in the decision to terminate Plaintiff.  Schaefer stated that it was her understanding that Plaintiff would have been terminated anyways based on the Investigation, (Schaefer Dep. 54:11-14), and stated that when the decision to fire Plaintiff was made, Gardin had told her that she had concluded that Haidar was a broker.  (*Id.* at 42:12-19.)  Schaefer also testified that Mazur and Minghine expressed an agreement to terminate Plaintiff on the basis of the Investigation.  (*Id.* at 53:6-13.)  Such testimony, however, only demonstrates that Plaintiff's violation of Section 8.3 of the Code may have served as a pretext to fire her based on the Investigation.  To establish pretext of discrimination, Plaintiff must still establish a genuine issue of material fact exists as to whether the results of the Investigation were  generated by a discriminatory animus in order to demonstrate that Mazur, Schaefer, and Minghine relied on "tainted" evidence when deciding to terminate Plaintiff.

Plaintiff points out that the Investigation ultimately turned up nothing to substantiate Gardin's earlier conclusion that Plaintiff knowingly dealt with a loan broker.  (Pl.'s Resp. 18.)  Gardin based her assessment that Haidar was a broker in part on six instances where a customer wrote a check to Haidar shortly after obtaining a loan from Charter One.  (Gardin Dep. 100:12-102:1.)  Gardin admitted that she did not know that those checks were written as brokerage fees, and

---

[9] The United States Supreme Court recently held that an employer may be held liable for unlawful discrimination if the ultimate employment decision was based on the "discriminatory animus" or bias of another employee, even if that employee is not the ultimate decision-maker.  *Staub v. Proctor Hosp.*, 131 S. Ct. 1186, 1194 (2011).

did nothing to confirm that they were payments for procuring loans.  (*Id.*)  It is irrelevant, however, whether Gardin did a good job or an incompetent job investigating the allegations contained in the Anonymous Letter as long as her conclusion that Plaintiff dealt with a broker was not driven by a discrimination against Plaintiff based on her association with Arab Americans.  Likewise, it is not dispositive that her conclusion ultimately turned out to be incorrect.

Plaintiff argues that because Gardin focused the Interview on Plaintiff's alleged relationship with Ankouni, the "only reasonable inference" that can be drawn is that Gardin discriminated against and harassed Plaintiff on the basis of her association with Arab Americans.  (Pl.'s Resp. 13.) Plaintiff further contends that "given the evidence of Ms. Gardin's animus toward Plaintiff based on Lois's association with Mr. Ankouni, the Charter One decisionmakers' reliance on Ms. Gardin's biased information raises an issue of fact as to pretext."  (*Id.* at 18.)

While there are many aspects of Plaintiff's allegations that do not suggest a discriminatory animus, the Court holds that a genuine issue of material fact exists regarding whether Gardin's conclusions were based on discrimination because of Plaintiff's association with Arab Americans.

As to Plaintiff's claims regarding Gardin, Plaintiff testified that at no point did she complain to Gilbert or Gardin that she had been discriminated against or that Arab-American customers were being discriminated against.  (Nemeth Dep. 268:19-269:17.)  Plaintiff has not put forth any evidence establishing that Gardin or Gilbert were even aware she ever made such complaints.

Certain aspects of the Interview that Plaintiff found unprofessional could be described as neutral with respect to discrimination on the basis of national origin.  For example, Gardin reviewed her and her husband's bank statements and other personal financial materials (*id.* at 275:15-276:25), and  questioned Plaintiff about how she paid for the Mercedes she drove and her daughter's college

tuition.  (*Id.* at 277:1-278:6.)  Plaintiff testified that she was questioned about her personal finances for approximately two and a half hours.  (*Id.* at 353:16-18.)

When asked what her reasoning for asking about Plaintiff's personal finances was, Gardin stated "[t]o determine whether or not Lois was receiving kickbacks."  (Def.'s App. Ex. H, Deposition of Candace Gardin 62:14-16, Feb. 16, 2010.)  She said she wanted to investigate whether Plaintiff was receiving money from Haidar because employees are not supposed to deal with brokers, and receiving money to process a loan would be unethical.  (*Id.* at 62:20-63:1.)  Gardin testified that she looked through Plaintiff's and her husband's personal financial records to see if there was unusual activity that might indicate Plaintiff was receiving kickbacks.  (*Id.* at 72:11-73:7.)  Even when drawing all reasonable inferences in Plaintiff's favor, no reasonable jury could infer that Gardin's questioning into Plaintiff's financial affairs demonstrates her conclusion that Haidar was a broker was motivated by her prejudice against Plaintiff's association with Arab Americans.

However, Plaintiff also testified about the following harsh conditions of the interview, which lasted seven and a half hours.  Plaintiff stated both Gardin and Gilbert raised their voices a number of times.  (Nemeth Dep. 280:16-281:9.)  Plaintiff claims she asked for a break and Gardin and Gilbert told her they "would be getting to it" but never did.  (*Id.* at 288:16-19.)  She alleges that she asked to use the bathroom near the end of the Interview, but was told she was almost finished so she was never able to go before the end of the process.  (*Id.* at 288:22-289:3.)  She was also never given food or anything to drink.  (*Id.* at 289.)  According to Plaintiff, Gardin continuously called her stupid.  (*Id.* at 271:3-5.)  Gardin also allegedly insinuated that Plaintiff, who is married, had an Iraqi boyfriend and was "getting a bit of something-something on the side" from him.  (*Id.* at 270:21-271:1.)

23

The Court holds that Plaintiff's claims create a triable issue of fact for the jury with respect to the issue of pretext.  Plaintiff alleges that at the end of the multi-hour, no bathrrom break, no food or drink Interview, Gardin coerced her into signing the Statement, which contained several lies. (Nemeth Dep. 346:18-352:9.)  Indeed, Plaintiff claims her first statement was torn up by Gardin. (*Id.* at 347:2-3.)  She also alleges that she wrote a second statement that was not accepted and torn up.  (*Id.* at 347:13-20.)  Plaintiff claims that she was so exhausted at the end of the Interview that after Gardin rejected her first two statements she finally asked "what do I need to say to get out of here?" (*Id.* at 291:7-9.)  She then produced the Statement, which Plaintiff contends contained many inaccurate facts.

In the Statement, Plaintiff allegedly admitted that she and Cartagena went out to dinner with Haidar and afterwards he started referring loans to them via fax.  (Nemeth Dep. Ex. 15.)  The faxes would include a cover sheet from Haidar's company, Business Loan Consultants, a "consulted" application, and any supporting documents (ie: taxes or articles).  (*Id.*)  The Statement then states that in August of 2006, Plaintiff went to Haidar's office in Southfield on Nine Mile road.  Plaintiff allegedly wrote that when she visited the office if was obvious Haidar was charging because the name was BLC, and consultants charge for loans.  (*Id.*)  Later in August or September, Mahmoud Serhane came to Plaintiff and told her a customer said Haridar was charging him fees.  (*Id.*)  When Plaintiff asked the customer if this was true, however, he said it was not.  (*Id.*)  Finally, the Statement said "as I stated I take full responsibility for this." (*Id.*)  One aspect of the Statement that Plaintiff claims Gardin forced her to include was the part where she claims it was obvious that Haidar was charging customers for loans.  (*Id.* at 351:2-5.)

Gardin acknowledged that Plaintiff wrote more than one statement, and that she did not

accept Plaintiff's first version because it left out parts of the Interview that Gardin thought were important. She could not, however, recall what she asked Plaintiff to put back into her statement. (Gardin Dep. 80:18-81:16.) Gardin also recalled Plaintiff asked something to the effect of "what do I need to do to get out of here?" (*Id.* at 81:17-19.)

As stated above, one way a plaintiff can demonstrate an issue of fact exists regarding pretext is to show that the defendant does not really believe its own legitimate, non-discriminatory reason. *See Curry*, 669 F. Supp. 2d at 828 (quoting *Manzer*, 29 F.3d at 1084). A reasonable juror could find that the fact that Gardin coerced Plaintiff into making the Statement is evidence that she did not believe the admissions contained in it were actually true and demonstrates pretext because the Statement was ultimately relied heavily upon by both Gardin and the decision-makers when they concluded (incorrectly) that Plaintiff was knowingly dealing with a broker.

The following allegations also touch upon the issue of national origin. Gardin allegedly asked Plaintiff if she and her husband are from the Middle East. (*Id.* at 275:10-14.) She is Caucasian and not from the Middle East, and her husband Zoltan Nemeth is Hungarian. (*Id.*) Additionally, she was questioned about her relationship with Ankouni (her alleged Iraqi boyfriend who is, in fact Lebanese) for about an hour. (*Id.* at 353:13-15.) Plaintiff claims this demonstrates that the focus of the Interview was on her relationship with Ankouni and his alleged Iraqi origin. (Pl.'s Resp. 13.)

In support of this argument, Plaintiff also points to the deposition testimony of Jeffery Six and Akram Turk, two fellow Charter One employees at the time who were interviewed by Gardin. Six testified that Gardin asked many him many questions about whether Plaintiff was Arabic, and her Iraqi boyfriend. (Def.'s App. Ex. O, Deposition of Jeffery Six 63:18-24, 65:20-66:18, Mar. 2,

2010.)  He said that in his interview they talked very little about the Anonymous Letter and focused "more on the whole Arab-American thing and the Iraqi boyfriend."  (*Id.* at 70:12-24.)  He estimated that about 15 minutes were spent talking about the accusations in the Anonymous Letter and 2 hours and 45 minutes talking about Arab-Americans, Plaintiff's Iraqi boyfriend, and her owning a gas station.  (*Id.* at 98:1-5.)  Similarly, Turk testified that Gardin also asked him questions regarding Plaintiff's personal life and her alleged Iraqi boyfriend.  (Def.'s App. Ex. N, Deposition of Akram Turk 56:1-18, Jan. 27, 2010.)  The Court finds that these allegations, particularly the fact that Gardin admitted that she required Plaintiff to make several statements before finally allowing her to leave, demonstrate a genuine issue of material fact regarding pretext.

### B.    Hostile Work Environment – State of Michigan Claim

Establishing a claim for hostile work environment is the same under Michigan law as it is under Title VII.  *Curry*, 669 F. Supp. 2d at 833 (citing *Quinto v. Cross & Peters Co.*, 451 Mich. 358, 368-69 (1996)).  To prove a claim for hostile work environment, the plaintiff must show: (1) she belongs to a protected group; (2) she was subject to harassment; (3) that was based on her protected status; (4) that affected a term, condition, or privilege of employment; and (5) the defendant knew, or should have known, about the harassment and did not take appropriate action.  *Moore v. KUKA Welding Sys. & Robot Corp.*, 171 F.3d 1073, 1078-79 (6th Cir. 1999).  This test includes both an objective and subjective component.  *Randolph v. Ohio Dep't of Youth Servs.*, 453 F.3d 724, 733 (6th Cir. 2006).  The conduct must be so severe or pervasive such that it creates a hostile environment both to the reasonable person and the victim.  *Id.*

The court must consider the "totality of the circumstances" when analyzing whether the harassment was sufficiently pervasive or severe.  *Id.*; *see also  Williams v. Gen. Motors Corp.*, 187

F.3d 553, 561 (6th Cir. 1999). Some factors courts should consider include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Clark v. United Parcel Serv., Inc.*, 400 F.3d 341, 351 (6th Cir. 2005) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)). The very nature of hostile environment claims implies repeated conduct. *Curry*, 669 F. Supp. 2d at 832 (quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115 (2002)). "Isolated incidents, however, unless extremely serious, will not amount to discriminatory changes in the terms or conditions of employment." *Bowman v. Shawnee State Univ.*, 220 F.3d 456, 463 (6th Cir. 2000).

Plaintiff's hostile work environment claims are based on the March 14, 2007 "interrogation" only. (Compl.¶¶ 26, 34.)[10] The Court has already concluded that Plaintiff has demonstrated that at the very least a question of fact exits regarding whether she is a member of a protected class based on her association with and advocacy for Arab Americans. Furthermore, the Court finds that Plaintiff has alleged sufficient facts to indicate she was subjected to harassment (ie: prolonged interview over several hours without breaks, food, or water; being coerced into making the Statement; and being taunted repeatedly that she was stupid). For the reasons stated above, the Court also finds that Plaintiff has produced sufficient evidence from which a reasonable jury could

---

[10] In her deposition, Plaintiff claims that she thinks the harassment started in July of 2006 when she was "pulled into a meeting with Laura Jordan and Keith Mazur and talked to about the contents of the customers with the armored car service," however, the only allegations under Counts I and II regarding harassment revolve around the Interview. (Compl. ¶¶ 26, 34.) Furthermore, the earliest date of discrimination Plaintiff notes on her EEOC filing is March 14, 2007. (Nemeth Dep. 308:2-12.) Furthermore, at oral argument, Plaintiff's counsel clarified that she was not arguing that Defendant had created/permitted a pervasively hostile work environment, but rather that the Interview constituted one isolated incident of severe harassment.

find that the harassment was based, at least in part, on Plaintiff's association with Arab Americans.

However, Plaintiff's hostile work environment claim must fail because she cannot prove the harassment affected a term or condition of her employment. The fact is Plaintiff was suspended immediately following the Interview and was terminated before she returned to work. As a result, there was no time for (a) Defendant to become aware of the harassment, (b) Defendant to fail to remedy it, or (c) the harassment to affect Plaintiff's work performance. Although Plaintiff claims that "[g]iven that Ms. Gardin's treatment of Lois caused her to go into a deep depression and to cut off contact with everyone, Ms. Gardin's harassing conduct substantially interfered with Plaintiff's employment," (Pl.'s Resp. 13), the fact remains that Plaintiff did not have any employment opportunities for the harassment to interfere with because she was fired before coming back from her paid suspension. Accordingly, Defendant is entitled to summary judgment on Plaintiff's hostile work environment claims.

### C.    Retaliation Under The ELCRA

Both the ELCRA and Title VII prohibit retaliation against an employee for complaining about discrimination. *Curry*, 669 F. Supp. 2d at 831; *see also* Mich. Comp. Laws § 37.2701. In order to make out a *prima facie* case for retaliation, the plaintiff must demonstrate that: (1) she engaged in protected activity; (2) the defendant was aware the plaintiff engaged in that activity; (3) the defendant took an adverse employment action against the plaintiff; and (4) there was a causal connection between the protected activity and the adverse action. *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000). If the plaintiff establishes a *prima facie* case for retaliation, the analysis follows the same burden-shifting framework as disparate treatment claims. *Imwalle v. Reliance Med. Prods., Inc.*, 515 F.3d 531, 545 (6th Cir. 2008). Defendant, however, argues that the

National Bank Act, 12 U.S.C. § 21 *et. seq.* (the "NBA"), preempts Plaintiff's state-law retaliation claim.  (Def.'s Br. 10.)  In turn, Plaintiff contends that Defendant is barred from raising this defense because it failed to plead preemption as an affirmative defense in its Answer.  (Pl.'s Resp. 8.)

### 1.      The National Bank Act

The NBA grants federally chartered banks many powers including "all such incidental powers as shall be necessary to carry on the business of banking . . . ."  12 U.S.C. § 24 (Seventh). Such incidental powers include negotiating promissory notes, bills of exchange, receiving deposits, buying and selling exchange, loaning money on personal security, and issuing and circulating notes. *Id.*  The NBA also states that national banks shall have the power "[t]o elect or appoint directors, and by its board of directors to appoint a president, vice president, cashier, and other officers, define their duties . . . dismiss such officers or any of them at pleasure, and appoint others to fill their places."  § 24 (Fifth).  For the following reasons, the Court holds that neither provision of the NBA preempts Plaintiff's retaliation claim.

### a.      Plaintiff is Not an Officer Covered by § 24 (Seventh)

While state laws that seek to regulate national banks or that substantially interfere with rights granted by the NBA are preempted, the United States Supreme Court has stated that "[f]ederally chartered banks are subject to state laws of general application in their daily business to the extent such laws do not conflict with the letter or the general purposes of the NBA."  *Watters v. Wachovia Bank, N.A.*, 550 U.S. 1, 11 (2007).  Additionally, implementing regulations have explained that state tort laws "are not inconsistent with the deposit-taking powers of national banks and apply to national banks to the extent that they only incidentally affect the exercise of national banks' deposit-taking

powers." 12 C.F.R. § 7.4007(c)(2). Although Defendant argues that the underlying complaints Plaintiff made, and which she claims Defendant retaliated against her for, concern Charter One policies related to their deposit-taking powers (ie: not having Arabic prompts, requiring cash deposits be made via armored car at an off-site depository, etc), that is not the critical inquiry. The question is whether compliance with the ELCRA, and specifically its prohibition against retaliating against employees who engage in protected conduct, more than incidentally affects Charter One's powers under the NBA. The Court fails to see how being prohibited from discriminating or retaliating against employees for complaining about possible discrimination interferes with any function "necessary to carry on the business of banking." *See* § 24 (Seventh). As a result, the Court holds that section 24 (Seventh) does not preempt Plaintiff's claim.

### b.      ELCRA Does Not Interfere With Defendant's Rights Under § 24 (Fifth)

The NBA affords Defendant the right "[t]o elect or appoint directors, and by its board of directors to appoint a president, vice president, cashier, and other officers, define their duties . . .dismiss such officers or any of them at pleasure, and appoint others to fill their places." § 24 (Fifth). The Sixth Circuit has interpreted this section of the NBA as applying only to officers appointed and dismissed by the bank's board of directors. *See Wiskotoni v. Mich. Nat'l Bank-West*, 716 F.2d 378, 387 (6th Cir. 1983) ("The terms of § 24 (Fifth) require[] that officers be appointed and dismissed by a national bank's board of directors."). In *Wiskotoni*, the court held that the plaintiff's wrongful termination claim was not preempted by the NBA because he was neither appointed nor dismissed by the bank's board. *Id.* Both federal and state lower courts follow *Wiskotoni* and analyze whether the plaintiff was hired and/or fired by the defendant's board of directors when determining whether § 24 (Fifth) preempts state anti-discrimination laws. *See, e.g.*,

30

*Farmer v. Nat'l City Corp.*, No. C-2-94-966, 1995 WL 918311, at *5 (S.D. Ohio Sept. 12, 1995);

*Boesch v. Champaign Nat'l Bank*, No. 24014, 2008 WL 2582979, at *4-5 (Ohio App. June 30,

2008).

In the instant case, it is clear that Plaintiff was not fired by Charter One's board of directors.

The evidence demonstrates that the decision-makers were Mazur, Minghine, and Schaefer – none

of whom are board members.  Additionally, there is nothing in the record indicating that they simply

recommended that Plaintiff be terminated and that Defendant's board ultimately made the decision.

Accordingly, the Court finds that § 24 (Fifth) is inapplicable and that the NBA does not preempt

Plaintiff's retaliation claim.  As a result, it is unnecessary for the Court to determine whether

Defendant waived its right to assert this affirmative defense.

### 2.      The *Prima Facie* Case For Retaliation

In order to make out a *prima facie* case for retaliation, the plaintiff must demonstrate that:

(1) she engaged in protected activity; (2) the defendant was aware the plaintiff engaged in that

activity; (3) the defendant took an adverse employment action against the plaintiff; and (4) there was

a causal connection between the protected activity and the adverse action.  *Nguyen*, 229 F.3d at 563.

Because there is no dispute that Plaintiff's suspension and termination constitute an adverse

employment action the Court need only address the first, second, and fourth prongs of this test.  For

the following reasons, the Court holds that Plaintiff has presented evidence sufficient to make out

a *prima facie* case.

### a.      Protected Activity

Complaining to anyone (management, unions, other employees, or newspapers) about

allegedly unlawful practices is protected conduct.  *Niswander v. Cincinnati Ins. Co.*, 529 F.3d 714,

721 (6th Cir. 2008) (quoting *Johnson v. Univ. of Cincinnati*, 215 F.3d 551, 578 (6th Cir. 2000)) (quotation marks omitted). Defendant claims that Plaintiff's retaliation claim must fail because she has no evidence that any of the policies she complained about in fact discriminated against Arab-Americans in violation of ELCRA. (Def.'s Br. 12.) Plaintiff argues that her belief that violations were taking place only needed to be reasonable, and that her claim does not fail simply because she did not specifically use the word discrimination. (Pl.'s Resp. 10.)

The Court agrees with Plaintiff. The Michigan Court of Appeals clearly indicated that a plaintiff's complaints will be considered protected activity under the ELCRA simply by raising the specter of discrimination. *McLemore v. Detroit Receiving Hosp. & Univ. Med. Ctr.*, 196 Mich. App. 391, 396 (1993) (disagreeing strongly with the Sixth Circuit's interpretation of the ELCRA in *Booker v. Brown & Williamson Tobacco Company*, 879 F.2d 1304, 1312-14 (6th Cir. 1989), which held that the act "did not protect from retaliation an employee who had merely expressed concern to his employer about possible discrimination"); *see also Welch v. W.R. Grace & Co.-Conn., Dearborn Div.*, No. 94-cv-75198, 1995 WL 871196, at *5 (E.D. Mich. Apr. 27, 1995). "The plaintiff need not show that a violation actually occurred. It is good faith and reasonableness, not the fact of discrimination, that is the critical inquiry in a retaliation case." *David v. ANA Television Network, Inc.*, Nos. 98-2288 & 98-2289, 2000 WL 222575, at *5 (6th Cir. Feb. 16, 2000) (quoting *Rocker v. Higher Educ. Aids Bd.*, 669 F.2d 1179, 1182 (7th Cir. 1982)) (quotation marks and brackets omitted). The Court finds that Plaintiff has raised a genuine issue of material fact as to whether her many complaints raised the specter of discrimination.

### b. Defendant Was Aware Of Plaintiff's Protected Activity

Defendant claims that "[n]ot one of the individuals involved in the investigation or the

decision to discharge Nemeth knew that she had complained that Charter One policies were discriminatory toward Arab-American customers." (Def.'s Br. 13.)  The Court finds that Plaintiff has provided sufficient evidence to make out a *prima facie* case that Minghine and Mazur were aware that Plaintiff had raised the specter of discrimination.

Plaintiff testified that she spoke to approximately fifteen people above her at Charter One regarding the account closures between 2003-07. (Nemeth Dep. 155:14-17.) Although she admitted that she did not tell all of them that she thought the policy was discriminatory (*id.* at 156:11-15), Plaintiff claimed she told Felici that the account closures were discriminatory in 2005 on multiple occasions. (*Id.* at 229:21-230:9.) She also said that she would discuss the issue with Larsen every time one of her accounts was closed in 2006, which occurred many times in December 2006, and that she remembered using the word discriminate during those conversations. (*Id.* at 159:1-7, 234:13-14.) Plaintiff also claimed that she had several conversations with Larsen about her concern that the policy requiring customers to use an armored car service was discriminatory. (Nemeth Dep. 128:11-20.)  Minghine testified that she had weekly staff meetings with her regional managers (Larsen being one of them) where she received lots of "updating." (Minghine Dep. 31:7-13.)

Plaintiff also testified about a conversation with Minghine regarding the account closures. (Nemeth Dep. 234:22-236:18.) She did not recall saying that the closures were discriminatory, but thought she mentioned that people in the community were saying that Charter One was discriminating against Arab Americans. (*Id.*)  Additionally, Plaintiff stated that she had a conversation at the end of 2006 regarding the account closures with Mazur, during which she told him "we are having just a horrible time with the account closures." (*Id.* at 237:6-7.) She did not recall using the word discriminate ever, but again felt like she relayed to him that the community

33

was feeling discriminated against.  (*Id.* at 237:13-23.)  These allegations taken together demonstrate that, at the very least, Plaintiff raised the specter of discrimination to Mazur and Minghine.

### c. Causation

Where an adverse action occurs shortly after protected activity, the close temporal connection raises an inference that satisfies the causal connection for purposes of making out a *prima facie* case.  *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525-26 (6th Cir. 2008); *Smith v. City of Salem*, 378 F.3d 566, 571 (6th Cir. 2004).  Furthermore, the burden of proof at this stage is "minimal."  *Upshaw v. Ford Motor Co.*, 576 F.3d 576, 588 (6th Cir. 2009).  "[A]ll the plaintiff must do is put forth some credible evidence that enables the court to deduce that there is a causal connection between the protected activity and the retaliatory action.  *Id.*

Plaintiff argues that while she voiced her complaints at various times from 2005 to early 2007, the close temporal proximity between Cartagena's phone call to CEO Larry Fish, the resulting fallout in January 2007, and her termination in March 2007 after 25 years of otherwise exemplary service to Defendant creates an inference of causation.  (Pl.'s Resp. 11.)  Additionally, Plaintiff argues that her multiple complaints about discrimination, and the policies generally, to Felici, Larsen, Minghine, and Mazur would allow a reasonable juror to infer that Plaintiff's complaints were a factor in making the decision to fire her.  (*Id.*)  The Court agrees that Plaintiff has met the "minimum" burden necessary to establish a *prima facie* case for retaliation under the ELCRA.  The evidence demonstrates that Plaintiff raised the specter of discrimination to Mazur and Minghine on multiple occasions and explicitly complained that Defendant's policies were discriminatory to Felici and Larsen, who reported directly to Mazur and Minghine.

Additionally, even though Plaintiff played no role in Cartagena's phone call to Fish, it seems

34

Defendant attributed some responsibility for it to her. She received multiple phone calls about the incident, and the entire branch was required to attend a meeting with AML to go over their procedures as a result of the call. Thus, a jury could infer that Defendant blamed Plaintiff for Cartagena's call and believed she and the rest of her branch harbored similar views.

Because the rest of the analysis for retaliation claims under the ELCRA follows the same burden-shifting framework under *McDonnell Douglas*, the Court need not reiterate the reasons why Defendant has put forth a legitimate, non-discriminatory reason for the adverse actions or why Plaintiff has sufficiently demonstrated a genuine issue of material fact with respect to pretext. Accordingly, the Court holds that summary judgment is improper, and DENIES Defendant's motion with respect to Plaintiff's retaliation claim under the ELCRA.

## IV.   Conclusion

For the reasons stated above, Defendant's motion for summary judgment is GRANTED IN PART and DENIED IN PART. The Court GRANTS the motion regarding Plaintiff's hostile work environment claim, but DENIES it in all other respects.

**SO ORDERED.**


S/Paul D. Borman
PAUL D. BORMAN
UNITED STATES DISTRICT JUDGE

Dated:  June 24, 2011

CERTIFICATE OF SERVICE

Copies of this Order were served on the attorneys of record by electronic means or U.S. Mail on
June 24, 2011.


S/Denise Goodine
Case Manager